– FOR PUBLICATION –

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ORI FEIBUSH,** | **CIVIL ACTION** |
|       **Plaintiff,** | |
|     **v.** | |
| **KENYATTA JOHNSON,** | **NO.  14-3947** |
|       **Defendant.** | |

## OPINION

This is a case in which the interests of a real estate developer whose activities contributed in part to the gentrification of the Point Breeze section of Philadelphia collided with the vision of the City Councilman who represents the neighborhood.  It centers on a decision by Defendant Philadelphia City Councilmember Kenyatta Johnson ("Johnson") not to introduce a resolution into City Council approving the sale of two City-owned properties located in Point Breeze, to Plaintiff Ori Feibush ("Feibush").  Given the long-established custom of "councilmanic prerogative" or "councilmanic privilege" – a custom of deference by other Councilmembers to the elected Councilperson as to matters of zoning and land sales in his or her district – Johnson's refusal to introduce the resolution in effect scotched the sale.  Feibush sued for violation of his First Amendment rights on the theories that Johnson's decision was in retaliation for criticisms he made of the Councilman and because he challenged the Councilman for office. Trial proceeded on a municipal liability claim against Johnson in his official capacity.  Both parties agreed that in order to prevail, Feibush would have to show at trial that Johnson's decision was made in retaliation for his critical comments of Johnson and his decision to run for office. Additionally, Feibush would have to show that the moving force behind the decision was

1

councilmanic prerogative – which the parties stipulated was an official custom of the city of Philadelphia.

At trial, prior to the case going to the jury, Johnson moved pursuant to Federal Rule of Civil Procedure 50 for judgment as a matter of law which motion the Court denied. The jury found for Feibush and awarded him thirty-four thousand dollars ($34,000). Before the Court is Johnson's renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50.

## I.    FACTS

### A.  Background

Feibush is a self-described real estate broker and developer working primarily out of the Point Breeze section of Philadelphia, a neighborhood represented by Councilman Johnson and in which Johnson grew up and still lives. Trial Tr. 176:10, 203:17-21, 205:4-6, May 10, 2016 (ECF No. 108). Feibush has personally and on behalf of clients been involved in the development and property management of more than five hundred properties across the City. *Id.* at 204:24-205:3, 243:12-21. One of Feibush's strategies as a real estate developer is to buy vacant City-owned property from Philadelphia for the purpose of developing it into housing. His focus is on building high market properties to attract young upwardly mobile professionals. *Id*. at 71:3-7.

Partly as a result of his efforts, the population of Point Breeze, which is an historically African-American, lower middle class neighborhood, began to change rapidly. *Id*. at 65:19-66:25. The gentrification process created tensions between existing residents and the new-comers and focused the attention of Councilman Johnson who noted with concern the rising taxes that gentrification brought with it as well as the potential displacement of long-term residents. *Id.* at 134:1-14, 144:7-24, 169:12-170:24.

The tensions in the neighborhood were writ large in the relationship between Feibush and Johnson. They were at cross purposes with respect to the future of Point Breeze – Feibush sought to build high market homes to bring new residents into the neighborhood, while Johnson favored what he described as a "healthy balance" of mixed income, affordable, and senior housing with some market rate projects. *Id.* at 71:3-7, 114:1-7.

They first met in or around 2011 while Johnson was running for City Council: Johnson saw Feibush in the neighborhood, walked up to him and introduced himself. *Id.* at 107:21-108:3, 207:1-6. Feibush responded that he had considered running for the same seat Johnson was running for. *Id.* Although he did not run in that election, Feibush did support Johnson's opponent and, when Johnson was elected, publically criticized the Councilman for his policies. *Id.* at 108:12-25.

Over time the relationship soured into one of personal animosity. *Id.* at 107:23-108:15, 235:17-19. In an article published in Philadelphia Magazine in May 2013, Feibush made no bones about his dislike of Johnson, calling him a "poverty pimp" and accusing Johnson of "harness[ing] his position of power for evil rather than good." *Id*. at 180:21-181:2, 212:5-11. That same article reported that Feibush was interested in running against Johnson for a seat on the City Council. *Id.* at 112:11-13, 180:15-20, 182:7-17. Johnson took the report to mean that Feibush was "an official candidate" for his seat. *Id.* at 110:9-10.

Later that year, in November of 2013, Feibush sent an email to supporters notifying them of a fundraiser to be held on December 12, 2013. *Id.* at 251:15-24. The day after the fundraiser, Feibush registered a political action committee ("PAC") and deposited approximately one hundred thousand dollars ($100,000) into the PAC. *Id.* at 213:4-24. To become a candidate, however, one must register with the City Ethics Commission which Feibush did on December

31, 2013 thus making it official that he was running for Councilman Johnson's seat on City Council.  *Id.* at 111:13-15, 258:2-12.  The next month, Feibush opened a campaign office, hired staff, began holding meet-and-greets, knocked on doors in the district, and did "anything and everything a candidate would do to meet the residents of a community."  *Id.* at 214:11-215:10, 221:10-16.  During this period, he also began to raise a "significant[]" amount of money.  *Id.* at 221:17-18.

Despite the two men's dislike of each other, Feibush's strategy of buying City-owned property in Point Breeze and then developing it required him to work with Johnson's office. Under Philadelphia's Home Rule Charter, City-owned real property can only be conveyed if City Council passes a resolution approving the sale.  *Id.* at 24:9-13. Thus, no sale of City-owned land in Point Breeze – or, indeed, in any area of the City – can move ahead without a resolution being passed by City Council.  Pursuant to councilmanic prerogative, members of City Council generally yield on issues of zoning and land sales to the wishes of the Councilmember in whose district an issue arises.  *Id*. at 64:9-65:18.  In the context of City-owned lots, councilmanic prerogative gives individual Councilmembers wide authority to control sales in their district because the other Councilmembers will defer to them to introduce the resolution to approve the sale.  *Id*. at 103:19-25.  The theory underpinning this custom of deference is that the Councilperson in whose district a development would occur knows their neighborhoods, their constituents and the context of any development patterns in their district, and is, therefore, in a better position to judge a development proposal.  *Id*.

The parties introduced evidence at trial describing the process for the sale of City-owned land in Philadelphia during the relevant time period including the application of councilmanic prerogative.  To oversee the City's several thousand properties, City Council created the Vacant

Property Review Committee ("VPRC") to review the use of each lot and determine whether to "declare it surplus." *Id.* at 26:25-27:4.  Once a property is initially reviewed, it is transferred to the Philadelphia Redevelopment Authority ("RDA"), an organization that manages the sale of City-owned vacant lots for disposal. *Id.* at 27:1-9.

All properties owned by the RDA are listed online where members of the public can view their availability and submit an expression of interest. *Id.* at 21:3-6.  Before listing a property, however, the RDA coordinates with City Council to ensure that the Councilmember in whose district the property is located is willing to introduce the resolution required to approve the sale. *Id.* at 21:3-19, 23:16-19, 28:15-21.  If that Councilmember will not consent to the sale, then "realistically," because of the custom of councilmanic prerogative, the RDA cannot complete the process. *Id.* at 32:7-24, 39:17-24.

Brian Abernathy ("Abernathy") worked as the Executive Director of the RDA from 2013 to 2016 and testified at trial as to its operations during that period. *Id.* at 18:24-20:13.  The RDA generally used three methods to dispose of City-owned lots: competitive sale; direct sale; and request for proposals. *Id.* at 20:16-21.  Where multiple expressions of interest were received, or where the offered price was less than the listed value, the RDA put the property up for a "competitive sale," that is, it solicited informal offers from other parties.  In a competitive sale, the RDA's goal was to secure the highest price possible while considering the bidder's intentions, capabilities, and past development experience. *Id.* at 21:7-14, 23:22-24.  When the City had a specific intended use for a property or properties – affordable housing, for example – the RDA would issue a request for proposals intended to solicit information on developers' backgrounds, past projects, and plans for the site. *Id.* at 25:25-26:9.  An internal committee would then make a recommendation and, in consultation with the City Council and the City

5

Planning Commission, the RDA would make the final award to the chosen individual.  *Id*. at
26:10-17.  In a direct sale, the City sold a property directly to a specific individual or sold it for a
specific purpose.  *Id.* at 24:3-8.  The RDA nevertheless generally required a market value
appraisal to ensure that the City received a fair price for the property.  *Id.*

Even if there is only one expression of interest in a property, Susie Jarmon ("Jarmon"),
Chairperson of the VPRC, testified that a prospective buyer must still secure the support of the
City Councilmember in whose district the property is located to complete the sale.  Trial Tr.
18:5-24, May 11, 2016 (ECF No. 109).  In the initial phases this can be as simple as a letter of
support from the Councilmember, but it ultimately must extend to the introduction of a
resolution approving the sale for the buyer to complete the purchase.  *Id.*  Thus, Jarmon testified,
the process starts and ends with the Councilmember in whose district the property lies.  *Id.*

Once the RDA completed its solicitation process, the VPRC voted on whether to approve
the sale and, if approved, referred the matter to City Council for a resolution formally approving
the sale, as required by the City Charter.  Trial Tr. 24:9-13, 29:11-30:5, 31:11-20, May 10, 2016
(ECF No. 108).

### B.  The Cleveland Street Lots

In January of 2014, the same month that Feibush began campaigning in earnest, two City-
owned lots at 1316-1318 Cleveland Street ("the Lots"), located in Johnson's district, were listed
for sale.  Trial Tr. 46:11-21, 216:5-18, May 10, 2016 (ECF No. 108).  The Lots were put up for a
competitive bid after Abernathy's staff at the RDA approached Johnson and secured his initial
approval for the sale.  *Id.* at 46:22-27:8, 48:1-12, 22-25.  At the time the Lots were offered to the
public, there were no affordable housing or other specific plans for the site.  *Id.* at 48:7-25.

On January 31, 2014, Feibush submitted an offer to pay fifty-one thousand dollars ($51,000) for the Lots with the intention of building two single-family homes.  *Id.* at 216:7-217:4.  In his expression of interest, Feibush supplied his name, proof of funds, and a commitment to build within one year; he did not indicate what he intended to construct on the Lots.  *Id.* at 216:19-217:4.  Thereafter, Feibush received an email from the RDA informing him that his bid had been accepted, and the VPRC subsequently approved the prospective sale.  *Id.* at 49:8-18, 217:22-219:2.  In preparation for development, Feibush bought other properties on the same block as the Lots, hired an architect, commissioned a geotechnical analysis, and retained an attorney, spending approximately one hundred thirty-seven thousand dollars ($137,000) with the expectation that Johnson would introduce a resolution approving the sale of the Lots.  *Id.* at 219:3-220:8.

Although, when it comes to the sale of City-owned real estate in his district, Johnson normally focuses on broader policy considerations rather than individual sales, in the case of the Lots – aware that Feibush was the highest bidder and that Feibush was officially running against him – he discussed the specific sale with Steven Cobb ("Cobb") his Director of Legislation.  *Id.* at 131:8-10, 133:3-15.[1]  Johnson subsequently declined to introduce a resolution to authorize the sale of the Lots.  *Id.* at 50:2-5, 220:21-23.  Cobb explained to Abernathy that between the time of the initial listing and the VPRC approval Johnson had decided that he would only approve transactions that supported affordable housing.  *Id.* at 50:18-51:4.  Abernathy testified that he had never before seen Johnson refuse to introduce a resolution approving a land sale in his district.  *Id.* at 52:1-4.  He also testified that he could not recall any instance in which another

---

[1] Johnson testified that he does not generally directly deal with individual sales of vacant properties in his district, choosing to focus on broader policy considerations.  *Id.* at 114:1-18.  Instead, Cobb  and other staff members handle the day-to-day details of Johnson's land sale policies and communicate with the appropriate City agencies.  *Id.* at 94:5-7, 106:8-10, 118:1-13.

Councilmember introduced a resolution to approve the sale of City-owned land in Johnson's district.  *Id.* at 39:1-16, 86:2-6, May 10, 2016 (ECF No. 108).

Johnson testified that that he "didn't think it was a big deal" to decline to introduce a resolution for the sale of the Lots when Feibush had recently purchased six, unrelated properties from the City.  *Id.* at 197:16-198:8.  After declining to introduce a resolution approving the sale of the Lots on the premise of preferring affordable housing, however, Johnson introduced resolutions for other properties in his district for market-rate housing.  *Id.* at 55:8-23, 135:18-136:12, 138:21-144:11.

When Feibush learned that Johnson would not introduce a resolution to approve the sale of the Lots, he emailed Johnson, Cobb, and others at the RDA, but received no response.  *Id.* at 221:24-222:17.  Neither Johnson nor his staff ever approached Feibush to discuss whether he would be willing to build affordable housing on the Lots.  *Id.* at 159:2-7.  As a result of Johnson's refusal to introduce the necessary resolution and because of the custom of deference pursuant to councilmanic prerogative, Feibush was unable to purchase the Lots.  *Id.* at 136:4-10, 212:23-25, 220:21-221:4.  Accounting for the costs he had already incurred in anticipation of the sale, Feibush testified that he would have made approximately two hundred sixty-four thousand dollars ($264,000) in profit if he had been able to buy the Lots and develop them as he had planned.  *Id.* at 226:4-228:3.

Johnson subsequently introduced a resolution to City Council to transfer the Lots to the Philadelphia Land Bank for disposal, whereupon they were relisted for sale without any restrictions on market-rate housing.  *Id.* at 152:1-4, 153:6-14, 154:15-22.

## II.    STANDARD

A motion for judgment as a matter of law may be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).  In considering the evidence, "the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version[,]" *id.*, and may grant the motion only if the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief."  *Trabal v. Wells Fargo Armored Serv. Corp.,* 269 F.3d 243, 249 (3d Cir. 2001) (quotation marks and citations omitted).  "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.'"  *Lightning Lube, Inc.*, 4 F.3d at 1166 (internal quotation omitted).

Because the jury returned a verdict in favor of the plaintiff, the record must be examined "in a light most favorable to the plaintiff," giving him the benefit of all reasonable inferences, "even though contrary inferences might reasonably be drawn."  *Dudley v. S. Jersey Metal, Inc.,* 555 F.2d 96, 101 (3d Cir. 1977).

## III.    DISCUSSION

All but Feibush's claim for municipal liability pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) were dismissed at the summary judgment stage.  At trial, Feibush proceeded under the theory that councilmanic prerogative was the moving force behind the violation of his First Amendment rights, arguing that Johnson retaliated against him for running for City Council and for insulting Johnson in public.  Johnson seeks judgment as a

matter of law on three grounds: (1) Johnson's conduct was not retaliation as a matter of law because no reasonable person in Feibush's position would have been deterred by Johnson's conduct; (2) the City Council's custom of "councilmanic prerogative" was not the moving force behind Feibush's constitutional injury; and (3) Feibush failed to offer evidence of the City's deliberate indifference to the constitutional rights of its citizens.

## A. Retaliation as a Matter of Law

In order to demonstrate that Johnson retaliated against him, Feibush had to prove that: (1) he engaged in conduct protected by the First Amendment; (2) Johnson's actions were sufficient to deter "a person of ordinary firmness" from exercising his constitutional rights; and (3) there was a causal connection between the protected activity and the retaliatory action. *See Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

Johnson does not contest here that Feibush fulfilled the first or third elements; rather, he asserts that a person of ordinary firmness *in Feibush's position* would not have been deterred by Johnson's conduct because Feibush was able to purchase many other properties from the City. Johnson's addition of the three words, "in Plaintiff's position" (Mtn. at 3), adds an extra layer of nuance that is not reflected in the case law. Feibush need only show that "a person of ordinary firmness" would have been deterred, nothing more; there is no requirement that the actionable conduct deter a person of ordinary firmness *in plaintiff's position*, or that it deterred the plaintiff personally, from exercising his rights. *See e.g.*, *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000); *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000); *Lauren W.*, 480 F.3d at 267.

The effect of the alleged conduct on the individual's freedom of speech "need not be great in order to be actionable," but only "more than *de minimis*." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (internal quotation omitted). Whether the retaliatory conduct reaches the

threshold of actionability is a question of fact for the jury.  *See Suppan*, 203 F.3d at 233.  Given

Feibush's testimony at trial regarding the financial impact of not being able to purchase the Lots,

the Court cannot conclude that the jury's determination that this potential loss was sufficient to

deter a person of ordinary firmness from exercising his constitutional rights, was unreasonable,

particularly where Johnson's motion fails to cite to the record or make evidence-based arguments

that support his assertion that Feibush failed to meet his burden of proof.

### B.  Moving Force

To succeed on a *Monell* claim, a plaintiff must show by a preponderance of the evidence

that his constitutional rights were violated and that a municipal custom or policy was the

"moving force" behind his injuries.  *Board of Cnty. Cm'rs of Bryan County v. Brown*, 520 U.S.

397, 400 (1997) ("*Bryan County*") (citing *Monell*, 436 U.S. at 694); *see also Andrews v. City of*

*Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990).  As discussed *supra*, Feibush presented

sufficient evidence for a jury to conclude that his constitutional rights were violated.  Further, the

parties stipulated that "councilmanic prerogative" is a custom of Philadelphia's City Council.

Trial Tr. 28:20-25, May 11, 2016 (ECF No. 109).  Additionally of note is that there is no contest

over whether the resolution required under the City Charter to approve the sale of the properties

is legislation.  Before the trial, in his summary judgment motion seeking dismissal on the

grounds of legislative immunity, Johnson asserted that the resolution required by the City

Charter to transfer City-owned property is legislation, Hr. Tr. Feb. 1, 2016 (ECF No. 50), and

evidence to that effect was presented at trial.  *See* Trial Tr. 75:7-21, May 10, 2016 (ECF No.

108).

In arguing that he is entitled to judgment as a matter of law, Johnson asserts: (1)

councilmanic prerogative was not the cause of the constitutional violation, only his personal

11

abuse of the prerogative; and (2) Feibush was required to show that the City displayed deliberate indifference to the constitutional violation and failed to do so.

In *Monell*, the Supreme Court decided that a municipality can be found liable under Section 1983 but only where the municipality itself caused the constitutional violation at issue. 436 U.S. at 691.  In reaching that decision, the Court was careful to set the outermost limits of municipal liability concluding that a municipality "cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  In extending Section 1983's ambit to municipal entities, the Court recognized two circumstances in which municipal liability may attach:  First, are those instances in which "lawmakers" execute a government policy or custom that inflicts a constitutional injury and, second, are those instances where the execution of the policy or custom was "*by those whose edicts or acts may fairly be said to represent official policy*.  *Monell*, 436 U.S. at 694 (emphasis added).

The facts of *Monell* fall within the first instance in that they "*involve[d] formal, written policies* of a municipal department and school board."  *Id.* at 713 (Powell, J. concurrence, emphasis added).  More specifically, the defendant, a municipal entity, had an official policy of requiring pregnant women to take unpaid leave before such time as it was medically necessary. The Court found that an official municipal policy was "unquestionably" the moving force behind the constitutional violation and, as such, the facts presented a "clear case" of municipal liability. *Id.* at 694.   Similarly, in *Owen v. City of Independence*, where a police chief had been terminated by resolution of the city council, the Court found that "injuries occasioned by a municipality's unconstitutional conduct were . . .  meant to be fully redressable through [section 1983's] sweep."  445 U.S. 622, 651-52 (1980).  *See also Pembaur v. City of Cincinnati*, 475 U.S.

469, 480 (1986) ("[n]o one has ever doubted . . . that a municipality may be liable under § 1983

for a single decision by its properly constituted legislative body – whether or not that body had

taken similar action in the past or intended to do so in the future – because even a single decision

by such a body unquestionably constitutes an act of official government policy."); *Bryan County*,

520 U.S. at 405 ("the conclusion that the action taken or directed by the municipality . . . itself

violates federal law will also determine that the municipal action was the moving force behind

the injury").

      The Third Circuit's decision in *Black v. Stephens*, 662 F.2d 181, 191 (3d Cir. 1981), is

also instructive.  In *Black,* the City of Allentown's Police Chief, a member of the Mayor's

cabinet, proposed and managed the police budget, and established policies and procedures for the

entire police department.  *Id.* at 191.  In that capacity, he wrote and implemented an official

police regulation concerning disciplinary hearings that the jury found proximately caused a

detective to file unwarranted charges against the plaintiff.  *Id.*  Allentown appealed a denial of

summary judgment on a *Monell* claim.  *Id.*  The Third Circuit affirmed the district court's

decision finding that the city "was held liable because of a governmental policy that *proximately*

*caused* [the constitutional violation.  The Chief's] promulgation of the regulation was an official

act of policy which the jury found *proximately caused* [the detective] to file unwarranted

charges."  *Id.* at 190-91 (emphasis added).

      The evidence presented at trial here falls within the contours of *Monell* and has strong

parallels to both *Owen* and *Black*.  The testimony was that the exercise of councilmanic

prerogative requires the acceptance and approval of each member of the City Council.  *See* Trial

Tr. 24:9-13, 32:7-24, 39:17-24, 64:9-65:18, May 10, 2016 (ECF No. 108).  Under the City

Charter, any member of City Council has the authority to introduce legislation by way of a

resolution approving the sale of City-owned land; yet, because of the custom of councilmanic prerogative, a sale generally[2] cannot proceed without the approval of the Councilmember in whose district the land sits.  *Id.*  So strong was the operation of councilmanic prerogative that Abernathy could not recall any instance in which a Councilmember other than Johnson introduced a resolution to approve the sale of City-owned land in Johnson's district.  Trial Tr. 39:1-16, 86:2-6, May 10, 2016 (ECF No. 108).  In the testimony concerning the strength of councilmanic prerogative generally, Abernathy testified that prior to the incident with Feibush and the Lots, he had never seen Johnson refuse to introduce a resolution approving a land sale in his district.  *Id.* at 52:1-4

Given the evidence, it was reasonable for the jury to conclude that the custom of councilmanic prerogative was the moving force behind the violation of Feibush's constitutional rights:  Johnson would not have been able to block the sale absent the councilmanic prerogative confident that he would not be subverted by his City Council colleagues because the custom required deference by them to his decision not to introduce the resolution.

## C.  Deliberate Indifference

Johnson's argument that his Rule 50 motion should be granted because Feibush has not demonstrated any evidence that Johnson was deliberately indifferent to the violation of his constitutional rights makes a category mistake.  It assumes that the facts of this case fall not within the first type of municipal liability cases identified in *Monell* (cases in which a government custom or policy of "lawmakers" causes the constitutional harm) but within the second type of cases (those in which where the execution of the policy or custom was "by those

---

[2] Abernathy testified that, as a custom of deference, Councilmembers did occasionally break with the idea of councilmanic prerogative, citing as an example an incident in which one Councilman introduced zoning legislation for casino development over the objection of the Councilman in whose district the properties lay.  Trial Tr. 65:1-18, May 10, 2016 (ECF No. 108).  As discussed *supra*, Abernathy could not recall any such interaction involving Councilman Johnson or his district.  *Id.* at 39:1-16, 86:2-6.

whose edicts or acts may fairly be said to represent official policy.")  *Monell*, 436 U.S. at 694.  In those latter types of cases there is a danger of collapsing Section 1983 liability into a *respondeat superior* liability.  The Supreme Court addressed that danger in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989), a case in which it considered for the first time whether a municipality's failure to train its employees could form the basis for liability under Section 1983. The plaintiff alleged that she was unconstitutionally denied medical treatment in police custody because police had no training to assist them in determining when to summon medical care for detainees.  The Court, emphasizing the importance of separating *respondeat superior* liability from a "'conscious choice by a municipality," reasoned that a municipality's shortcoming in training its employees could only "be properly thought of as a city 'policy or custom' that is actionable under § 1983" in a narrow set of circumstances, and identified those circumstances as those in which a plaintiff could demonstrate that the municipality's failure to train its employees amounted to "deliberate indifference [by the municipality] to the rights of persons with whom the police come into contact."  *Id.* at 388-89.

In this case, because Plaintiff's *Monell* claim was premised on the custom of City Council and the actions of a lawmaker in accordance with that custom rather than the conduct of City employees and the City's deliberate indifference thereto, the Plaintiff was not required to present evidence regarding deliberate indifference.

For the reasons set forth above, Johnson's motion for judgment as a matter of law shall be denied.

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**

15